WILLIAMS, J.
hThe defendant, Robert Dale Wilson, was charged by amended bill of information with two counts of molestation of a juvenile under the age of 13 and one count of molestation of a juvenile, violations of LSA-R.S. 14:81.2(A)(1) and (D)(1) and (B)(2). Following a jury trial, defendant was found guilty as charged of one count of molestation of a juvenile under the age of 13, and guilty of one count of indecent behavior with a juvenile under the age of ,13, and one count of indecent behavior with a juvenile, violations of LSA-R.S. 14:81. The trial court sentenced defendant to serve. 25 years at hard labor without the benefit of parole, probation or suspension of sentence for his molestation conviction, five years at hard labor, the first two years to be served without the benefit of parole, probation or suspension of sentence and five years at hard labor for his convictions of indecent behavior with a juvenile under age 13 and indecent behavior with a juvenile respectively, with the sentences to be served concurrently. Defendant’s motions for new trial, post-verdict judgment of acquittal and reconsideration of sentence were denied. The defendant now appeals. For the following reasons, we affirm in part, reverse in part and remand.
FACTS
In August 2012, H.R.,[1] an 11-year-old girl, visited her pediatrician, Dr. Hollo *518 way-Alford, with.a complaint of redness and pain in her vaginal area. During the exam, H.R. told the doctor that her grandfather, the defendant, had placed his fingers in her vagina. The doctor’s office reported this information to the police. In the investigation, the Caddo [¡.Parish Sheriffs Office contacted P.B., eleven years old, and B.B., 13 years old, two girls who lived with their mother and H.R.’s aunt in a residence next door to defendant. The girls reported inappropriate touching by defendant. After the three girls were interviewed at the Gingerbread House, defendant was questioned at the Sheriffs Office. At the conclusion of the interview, defendant was arrested and charged with two counts of molestation of a juvenile under the age of 13 and one count of molestation of a juvenile.
At trial, Angela Wilson, a daughter of defendant and mother of H.R. and two sons, testified that H.R. has had problems with skin-rashes on and around her vagina since infancy, -and that the- adults in the family, including defendant, would help apply the cream prescribed by H.R.’s physician to treat the rash. Angela stated that a year before defendant was arrested she spoke with'him and requested that he cease applying the cream to H.R.’s vaginal area because H.R. had entered 'puberty. Angela testified that she told defendant that only she and H.R.’s grandmother, defendant’s wife Debra, would help H.R. apply the cream from that point forward. According to- Angela, defendant said he understood her concerns about H.R. reaching puberty and he would cease placing ointment on H.R.’s skin. Angela stated that despite this conversation, she later learned from H.R. that defendant had continued to apply the ointment to H.R.’s vaginal area.
Angela explained that defendant referred to his grandchildren as “Papaw’s kids” and would dedicate one day a month to each grandchild, when the child would pick an activity to do with defendant, such as going to Ra movie or eating at a restaurant. Angela testified that,H.R. participated in these “Papaw-Grandkid Days,” but about a month prior to her disclosure to Dr. Holloway-Alford, the girl had “started making excuses about not wanting to go.” Angela also testified that she would periodically allow H.R. and her other children to stay with defendant and his wife añd that H.R. had sometimes gone to work sites with defendant, who performed odd jobs and simple contracting work at properties in the local area. '
H.R., the daughter of Angela Wilson, was born in 2001. In court, H.R. identified defendant as her grandfather, whom she called “Pápaw.” H.R. testified that she recalled- going to the Gingerbread House, talking to Jennifer Flippo and allowing the interview to be recorded. The videotaped recording of H.R.’s Gingerbread House interview was played for the jury and admitted into- evidence. In the interview, H.R. stated that the inappropriate contact had started occurring about a year before she told her doctor that defendant touched her vagina and that these incidents would happen when she was staying with her grandparents and while at work with defendant.
H.R. stated that she had a history of rashes in her vaginal area, that she had told defendant about them when she was staying with her grandparents, and that defendant applied medication to her skin for the rashes. H.R. described one of the instances when defendant touched her vagina as follows:
*519 The last time he did it we were in [a shed in back] where he puts all his tools and stuff, And there was a ffable in there and he put. me on it and ... he said he had to check and that’s what he called it, to see if I had scratches or anything. And he I ¿was hurting me so I told him to stop ‘cause I started crying and everything. And he’d wear gloves sometimes when he was in there ‘cause he has a lot of gloves ‘cause of his hand. He keeps doing that.
R.p. 90 (interviewer’s comments omitted). H.R. continued by stating that while she was lying flat on the table, defendant “put his finger in there,” indicating her vagina. H.R. described another episode when she was sitting on a recliner in defendant’s house and he sat on the recliner with her and “put his finger in the" hole ... and just, you know, [went] back and forth sometimes ... And sometimes, just stick it in-there. And when he did that, sometime, he’d like move, like he’d be on top ... And he’d like move ... and I could — you know, I could feel his parts — on my part.” R.pp. 88-89. H.R. .stated in the interview that she initially thought defendant was “just checking on me,” but she told her Aunt D.J. about defendant’s behavior because H.R. didn’t think that the touching was necessary. H.R. told the interviewer that she later found out that something had happened to P.B. and B.B, as well,, but did not know what exactly had occurred. ■
In= her trial testimony after viewing the Gingerbread House interview, H.R. explained her understanding that a lie is something that “didn’t happen, ... but the truth is what acthally happened or how you actually feel.” H.R. testified that she told Dr. Holloway-Alford the same information that she gave to the interviewer at the Gingerbread House. H.R. recalled speaking with Lucky Raley, an investigator with the Public Defender’s Office. H.R, testified that her first interview with Raley was recorded and that she told him the same information that she had. given to the Gingerbread House interviewer. H.R. explained that - she participated in [ B“Papaw-Grandkid” days, during - which defendant would take one of his grandchildren “wherever we wanted to go.” ' H.R. testified that she loved her grandfather, but that her description of his improper touching was the truth.
On cross-examination, H.R. stated that she spoke with Raley- twice and told him the same information on both occasions. H.R. testified that she had written letters to defendant while he was in prison and that she loved her grandfather, but reiterated that all of her allegations against defendant were the truth.
P.B., the daughter of Vera Gardner, was born in 2001 and is B.B.’s sister. At trial, P.B. testified that she, B.B., and their mother live with their Aunt D.J., who- is a daughter of defendant. In court, P.B. identified the defendant as her grandfather, whom she called “Papaw.” P.B. stated that telling the truth means saying something that really happened. P.B. testified that she recalled. going to the Gingerbread House, talking to Jennifer Flippo and allowing the interview to be recorded. The videotaped recording of P.B.’s Gingerbread House interview was played for the jury and admitted into evidence. ■ In the interview, P.B. stated that defendant touched her skin under her shorts when he and his wife were babysitting P.B. and B.B. while their mother was traveling out of state. P.B. told the interviewer that one day after she had returned home from school, defendant entered her room, closed the door and told her to leave the light off. P.B. stated that defendant then picked her up and touched her skin under her pants. P.B. said that the defendant’s hand was moving while he was touching her genitals.
*520 After the Gingerbread House interview was played for the jury, P.B. ^testified that “not all of’ what she said in the Gingerbread House interview was true. P.B. explained that her description of what happened was true, but that at the time of trial she thought that defendant’s inappropriate touching was an accident. At trial, P.B. confirmed her prior statement at the Gingerbread House that defendant touched her skin under her clothing:
MIDBOE: Okay. When you said when he pushed his hand on your private area, that it was moving?
P.B.: Yes. But it wasn’t like how y’all are thinking it was.
MIDBOE: Well, and I don’t want you to suppose how I’m thinking. Just tell me what happened.
P.B.: Like, it was, like, shaking, like a normal shake.
MIDBOE: Okay.
P.B.: Like you wouldn’t notice it if it was outside of your clothes.
R.pp. 445-46. P.B. stated that she later spoke with Raley, that the interview was recorded and that she told Raley that the defendant’s touching of her private area was accidental. P.B. recounted that defendant would blow raspberries, wrestle, tickle, and jump on the trampoline with P.B. and his other grandchildren. P.B. testified that she also told her mother that she felt as though defendant’s touching of her private area was an accident. She stated that she had written letters expressing her love and affection for defendant and had visited him in prison.
B.B., the daughter of Gardner, was born in 1998 and is P.B.’s sister. At trial, B.B. identified defendant as the man she refers to as “Papaw” and stated that even though they are not related by blood, she considers the ^defendant to be-family. B.B. testified that she recalled going to the Gingerbread House, talking to Jennifer Flippo and allowing the interview to be recorded. The videotaped recording of B.B.’s Gingerbread House interview was played for the jury and admitted into evidence. In the interview, B.B. stated that one incident had occurred while her mother was traveling out of state. B.B. said that as she was getting into bed the defendant came into her room and asked for a hug. B.B. stated that defendant then picked her up out of bed and touched her in her genital area. B.B. told the interviewer that she “wasn’t sure if he meant to or not.”
According to B.B., the other incidents occurred during the summer between the seventh and eighth grades. B.B. said that defendant put his mouth on her breasts when she accompanied him to two houses where he was performing minor repairs. B.B. stated that at each place, defendant hugged her, lifted up her shirt and bra, and put his open mouth on her breasts. B.B. told the interviewer that afterward, she felt shocked and confused and made sure that she was not alone with defendant anymore.
After viewing the Gingerbread House interview, B.B. testified as follows:
MIDBOE: Okay. Now, I want you to go kind of through it pretty carefully. I want you to tell me; are you saying that he never touched you at all, or are you saying he touched you differently from how you described it at the Gingerbread House?
B.B.: The only thing he’s ever done is hugged me. He’s never done anything sexual to me.
MIDBOE: Okay. Again, all I want you to do is tell me the truth to the best of your ability. What you’re — so what you’re telling these ladies and gentlemen of |Rthe jury is that he hugged *521 you. He’s- never had — he’s never done anything sexual to you?
B.B.: Never.
MIDBOE: Now, would it be fair to say that in the video, the things we saw in the video,- that every contact,' you talked about in the video, started with him saying that he wanted to give you a hug?
B.B.: He only wanted to give me a hug. He’s never done anything else.
MIDBOE: Okay. So you’re saying he — that he only ever gave you hugs?
B.B.: Yes.
MIDBOE: Now, let’s .,. get to the part where you said at the beginning where he put his mouth on your boob and stuff.
B.B.: Okay.
MIDBOE: Are you saying that that didn’t happen?
B.B.: It didn’t — it’s not whát happened.
MIDBOE: What — why then did you tell Ms. Flippo that it did happen?
B.B.: I have no idea.
MIDBOE: Were you confused on that day?
B.B.: I was not. I was only lying.
MIDBOE: Okay. You were lying?
B.B.: Yes.
MIDBOE: You were not confused?
B.B.: Yes.
MIDBOE: You were lying?
B.B.: Yes.
_LT *■ * ■ '
MIDBOE: So are you saying now that when he put his mouth on your boob, he was only giving you a raspberry?
B.B.: He only gave me a raspberry; He didn’t put his mouth on my boobs.
MIDBOE: So he only gave you a raspberry on your stomach?
B.B.: Yes.
MIDBOE: And now you’re saying that :what you said before was a lie?
B.B.: I was lying.
MIDBOE: Okay. Why did you lie that day?
B.B.: I have no idea.
MIDBOE: You don’t know why you said those'things?
B.B.: No.
MIDBOE: Did you feel like you were being pressured to say those things?
B.B.: No.
MIDBOE: Again, I don’t want to put ■' words in your mouth. I want you to explain to the ladies' and gentlemen why you said that and why you’re saying these things today.
B.B.: (No Response.)
R.pp. 463-465.
B.B. testified that she had spoken with Raley and told him that she had lied in her Gingerbread House interview. B.B. acknowledged that she loved her grandfather and that she did not want to see him in trouble.
Dr. Holloway-Alford testified that she had been H.R.’s treating physician during the relevant time period’. She stated that when she saw | inH.R. on August 11, 2012, the girl had complained of a continuing rash on her vagina and said that “Papaw sticks his fingers where the blood comes out.” According to Dr.' Holloway-Alford, after she- conducted a physical examination of H.R.’s genital area and noted outer labial redness, her office reported H.R.’s disclosure to the local police. She stated that she had previously prescribed Monis-tat cream for- H.R.’s condition. She testified that there are various causes for outer labial redness, including vigorous wiping of the area or digital penetration of the vagina.
*522 Jennifer Flippo testified that she is a forensic .interviewer at the Gingerbread House, which is a children’s advocacy center in Caddo Parish. Flippo emphasized the importance of word choice when interviewing children who have made allegations of sexual or physical abuse. According to Flippo, it would be “problematic” for an untrained investigator to question minors because the improper use of linguistics could lead to unintended answers or statements. Flippo testified that forensic interviewers are in a “better position” to interview children because of their specific training. She further testified that interviews at the. Gingerbread House are usually “one-time,” although it is not unheard of to bring a child back for “re-questioning.” On cross-examination, Flippo explained that Gingerbread House interviewers do not initiate contact with a child or request repeat interviews; rather, all such pre-interview contact is facilitated by the police department.
Vera Gardner, the mother of 'P.B. and B.B., testified that she and her- children live with Dolly King (“D.J.”), one of defendant’s daughters, on |nproperty adjoining that of defendant. Gardner stated that after their Gingerbread House interviews, both P.B. and B.B. recanted their allegations against defendant. Gardner testified that she informed defendant’s wife of the girls’ statements and they contacted the defendant’s attorney. Gardner stated that she then allowed an investigator, Raley, to question P.B. and B.B. individually. Gardner conceded that she could not say, with 100% certainty, that the incidents initially alleged by P.B. and B.B. did not happen.
Defendant’s wife,- Debra Wilson, testified that his relationship with their grandchildren is playful, and involves tickling, blowing raspberries, wrestling and jumping on the- trampoline. Debra stated that defendant takes care of his grandchildren when they are ill. She denied seeing anything inappropriate between defendant and H.R., P.B. or B.B. The state declined to cross-examine this witness.
Lucky Raley testified that he is an investigator for the Public Defender’s Office and that he had retired after 28 years.with the Bienville Parish Sheriff’s Office. He stated that he had been assigned to the juvenile division .of the .Public Defender’s Office for six years. Raley testified that he was initially trained on the job like an apprentice, but later took regular continuing education classes, which included training on how to interview witnesses and possible victims. He stated that he interviewed H.R., B.B. and P.B. upon a request by dttorney Harried, who was representing the defendant. Raley testified that after obtaining the mothers’ permission, he individually questioned each girl in February 2013. These three initial 112interviews were recorded, but the recordings were not admitted into evidence. Raley stated that in the initial interview, H.R. repeated the statements regarding the improper touching by defendant that she had made during her Gingerbread House interview. However, Raley asserted that when he questioned H.R. a second time in October 2013, the girl stated that the contact between her and defendant was a result of playing. Raley conceded that he had not received the same type of training as a forensic interviewer and that he might have unintentionally suggested the use of certain words by the girls when he questioned P.B., B.B. and H.R..
The defendant, Robert Dale Wilson, who Was born on July 15; 1950, testified that he is the biological grandfather of H.R., allegedly the biological grandfather of P.B., and considers B.B. to be like a granddaughter to him. Defendant stated that he and his wife, Debra, have five children and twelve grandchildren. He explained that “Pa *523 paw’s kids” was a term he used to refer to his grandchildren. Defendant testified that he had a playful relationship, with his grandchildren and that he would “scoop up” his grandchildren, including P.B. and B.B., blow raspberries on their sides or stomachs and spin them around. He described his relationship with H.R. as close. Defendant testified that H.R. had been prone to rashes since, early childhood. Defendant admitted to applying medication to H.R.’s vaginal rashes,. but denied. that there was anything sexual about ,his acts. Defendant stated that he saw himself as a caretaker for his family, and would “doctor” his children and grandchildren. He testified that H.R. would approach him expressing concern about her rashes and that sometimes if 11SH.R. did not have her cream then he applied Vaseline to her skin. Defendant stated that H.R. told him that she had a yeast infection and that at the time he did not understand how she could have that condition.
On cross-examination, defendant admitted' that even though he had been told by H.R.’s mother not to apply the cream'to H.R.’s vaginal rashes anymore, on one occasion after their conversation he had applied the cream to H.R.’s vaginal area. Defendant admitted to rubbing ointment on H.R.’s vaginal area in his work shed, but claimed that the girl had initiated the conversation, sat on the table in the shed and then pulled her own pants down to expose her genitals. Defendant stated that he had rubbed the ointment on H.R.’s vagina contrary to her mother’s instruction, but he did not think it was important enough to inform the girl’s mother about his conduct. Defendant denied inserting his finger into H.R.’s vagina and accused H.R. of lying in her Gingerbread House interview.
Defendant recalled wrestling, tickling and blowing raspberries with P.B. and B.B., in the same way he did with all of his grandchildren. He denied touching the breasts or vagina of either girl. Defendant admitted that he had entered P.B.’s bedroom when her mother was out of town and picked up P.B., but denied sliding his hand into her pants. Defendant claimed that he touched P.B.’s skin when he picked her up because she was wearing • shorts, but denied touching P.B.’s vagina. Defendant also denied raising B.B.’s shirt and bra up and placing his mouth on her breasts. Defendant admitted the possibility that his face could have touched the breast area of B.B. and P.B. during “the motion of playing,” but claimed he had no | uintention to do so.
After deliberating, the jury found defendant guilty as charged of molestation of a juvenile under age 13 (H.R.), guilty of indecent behavior with a juvenile under age 13 (P.B.), and guilty of indecent behavior with a juvenile (B.B.). Defendant’s motions for a new trial and for post-verdict judgment of acquittal were denied. Defendant was sentenced to 25'years at hard labor without the benefit of parole, probation or suspension of sentence for his molestation of a juvenile conviction. The trial court imposed a sentence of five years at hard labor, :with the first two years to - be served without benefits, for the defendant’s conviction of indecent behavior with a juvenile under- age 13 and five years at hard labor for the conviction of indecent behavior with a juvenile, with the. sentences to run concurrently. This appeal followed.
DISCUSSION
The defendant contends the state failed to present sufficient evidence to support the convictions.. Defendant, argues that the guilty verdicts should be reversed because the testimony at trial was contradictory, inconsistent and unreliable.
*524 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This' standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The Jackson standard is' applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497; State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. Likewise, the sole testimony of a sexual assault victim is sufficient to support a requisite ‘ factual finding. State v. Demery, 49,732 (La.App.2d Cir.5/20/15), 165 So.3d 1175, citing State v. Watson, 32,203 (La.App.2d Cir.8/18/99), 743 So.2d 239, writ denied, 99-3014 (La.3/31/00), 759 So.2d 69. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the-evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 2002-3090 (La.11/14/03), 858 So.2d 422.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the. reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of *525 law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Credibility determinations are the province of the trier of fact. State v. Johnson, 38,927 (La.App.2d Cir. 11/23/04), 887 So.2d 751; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
LSA-R.S. 14:81.2 states in pertinent part:
A. (1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence' of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons; with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile’s age shall not be a defense.
In order to convict an' accused of molestation of a juvenile, the state must prove beyond a reasonable doubt that defendant (1) was over the age of 17 and more than two years older than the victim; (2) committed a-lewd or lascivious act upon the person or in the presence of any child under the age of 17; (3) had the specific intent to arouse or gratify the sexual desires of himself or the victim; and (4) committed the act by usé of force, duress, psychological intimidation or by the’use of influence by virtue of a position of control or supervision over the juvenile. State v. Redfearn, 44,709 (La.App.2d Cir.9/23/09), 22 So.3d 1078, writ denied, 2009-2206 (La.4/9/10), 31 So.3d 381. A lewd or lascivious act is one which tends to excite lust and to deprave morals with respect to sexual relations and which is indecent. State v. Redfearn, supra.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the. prescribed criminal consequences to follow his act or failure to act. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982).
Evidence of other acts of misconduct is generally inadmissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes hini as a “bad person.” LSA-C.E. art. 404(B); State v. Jackson, 625 So.2d 146 (La.1993). However, LSA-C.E,' art. 412.2 provides that when an accused is charged with a sex offense involving a victim'under age 17, evidence of the accused’s commission of another crime, wrong or act indicating a lustful disposition toward children may be admissible. For the purpose of •Article 412.2, it is not necessary for the defendant to have been charged, prosecuted or convicted of the other acts described. State v. Layton, 2014-1910 (La.3/17/15), 168 So.3d 358; State v. Wright, 2011-0141 (La.12/6/11), 79 So.3d 309. The admissibility of such statements under Article 412.2 depends upon whether the probative value of the statements'substantially outweighs the danger of unfair prejudice, confusion of the issues, misleading the jury, of* by con *526 siderations of undue delay. LSA-C.E. art. 403; State v. Johnson, 50,005 (La.App.2d Cir.8/12/15), 175 So.3d 442. Where the element of intent is regarded as an essential ingredient of the 11flerime charged, it is proper to admit proof of similar but disconnected crime to show the intent with which the act charged was committed. Other crimes evidence is useful to assist the prosecution in proving that the defendant did not act innocently, and would negate any defense that he acted without intent or that the acts were accidental. State v. Jackson, supra.
In the present case, it is undisputed that H.R. was under the age of 13 at the time of the offense, defendant was over the age of 17 years with an age difference of more than two years and that defendant, as H.R.’s grandfather, was in a position of supervision or control over the girl. The record shows the following facts: (a) H.R. has a history of skin rashes on her genitals; (b) until approximately 2010-2011, defendant had been applying medicated cream to the rashes on her vagina; (c) sometime in 2010-2011, H.R.’s mother instructed defendant not to apply the medicated cream to H.R.’s vagina anymore; (d) that defendant agreed to discontinue applying the medicated cream; (e) but at the time of the “work shed” incident, defendant touched H.R.’s vagina.
Beyond the facts listed above, H.R.’s testimony that defendant’s touches were inappropriate — lewd or lascivious with the intent to gratify or arouse — was substantiated by Dr. Holloway-Alford’s opinion that H.R.’s vaginal redness could have been caused by inappropriate touching or digital penetration. H.R, described defendant’s conduct in the work shed consistently to the Gingerbread. House interviewer, Dr. Holloway-Alford, and when questioned by Raley in February 2013. H.R.- affirmed the truthfulness of the other allegations made in her Gingerbread House | gpinterview during trial. Those allegations could be viewed, at the very least, as evidence of defendant’s lustful disposition toward children under Article 412.2. H.R.’s failure to recall specific dates of the incidents of inappropriate touching does not prevent a jury from finding that her testimony was credible. See e.g. State v. Mickens, 31,737 (La.App.2d Cir.3/31/99), 731 So.2d 463, writ denied, 99-1078 (La.9/24/99), 747 So.2d 1118.
Based on the evidence, presented, viewed in the light most favorable to the prosecution, the jury could have inferred the requisite intent from H.R.’s testimony describing the occasions when defendant touched her without the medicated cream and from defendant’s statement that he had rubbed ointment on H.R.’s vagina at a time when he was not supposed to touch the girl’s vaginal area. While defendant claimed that he only touched H.R.’s vagina for, purposes of applying the. medicated cream and. denied all of.H.R.’s other allegations, reconciling any conflict among the testimony is within the purview of the jury. The statements of H.R. in the Gingerbread House interview and at trial contradicted the testimony of defendant. As a result, the jury was required to make a credibility call and as shown by the verdict, the jury clearly believed H.R.’s testimony.
This case is substantially similar on its facts to Scott v. State, 202 S.W.3d 405 (Tex.App.2006). In Scott, the offender was convicted. of indecency with a child. • On appeal, Scott challenged the sufficiency of the evidence, claiming that he touched the eleven-year-old victim’s vagina to apply medicated cream to her vaginal -rash. A nurse practitioner testified 121that children of the victim’s age should be able to apply medicated cream on their own. Furthermore, the victim testified that she knew *527 how to apply the medication herself and that Scott would put. his hands down her pants and move his fingers when no medication was involved. The court stated that the jury could have found the requisite intent based , on the child’s, testimony that Scott touched her without medication and that the jury could infer that he acted with the intent to arouse himself from the evidence that he rubbed her with lotion when the girl was able to apply it herself.
Here, as in Scott,- H.R. was eleven years old at the time of the allegations and H.R. testified that defendant touched her vagina when there was no medication involved. Although no one specifically testified that H.R. was able to apply the medication herself, defendant admitted that he. was told by H.R.’s mother that the girl was too old for him to treat H.R.’s vaginal rashes. Like in Scott, the jury in this case could have found that defendant’s act was lewd or lascivious and that he had,acted with the requisite intent to arouse or gratify.
After reviewing, the evidence in the record, we cannot say that the jury abused its discretion in convicting defendant of molestation of a juvenile under the age of 13. The jury chose to believe H.R.’s testimony over that of the defendant.. Based upon her testimony, the jury could reasonably have found that the state- proved the essential elements of the crime of molestation of a juvenile beyond a reasonable doubt. Thus, under the Jackson standard, the evidence presented is sufficient to support defendant’s conviction for molestation of a juvenile under the age of 13, LaH.R. This assignment of error is without merit.
The defendant also contends the state failed to present sufficient evidence to support the convictions of indecent behavior with a juvenile under the age of 13 (P.B.) and indecent behavior with a juvenile (B.B.). Defendant argues that the state failed to prove he. committed the offenses because at trial the witnesses recanted the prior statements, made: during their Gingerbread House interviews.
Indecent behavior with a juvenile is the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of 17, where there is ah age difference of greater than two years' between- the two persons, with the intention of arousing or gratifying the sexual desires of either person. LSA-R.S. 14:81. ■ ■
Extrinsic evidence, such as prior inconsistent statements, may be admitted when offered solely to attack the witness’s credibility. LSA-C.E. art. 607(D)(2); State v. Givens, 45,246 (La.App.2d Cir.6/9/10), 41 So.3d 589. Although prior inconsistent statements may be used to impeach witnesses on the issue of credibility, they generally could not be used as substantive evidence of the defendant’s guilt until the 2004 amendment of LSA-C.E. art. 801(D)(1)(a). State v. Jones, 48,624 (La.App.2d Cir.1/22/14), 132 So.3d 505; State v. Cobb, 2013-1593 (La.App. 1st Cir.3/27/14), 144 So.3d 17. Article 801(D) now provides in pertinent part:
A statement is not hearsay .if: 1. Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is: .
(a) In a criminal case, inconsistent with his- testimony, ■ provided | gsthat the proponent has first fairly directed the witness’s attention to the statement and the-witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement!.]
Thus, under Article 801(D)(1)(a), a prior inconsistent statement is not hearsay and *528 can be considered for the truth of the matter asserted,, if the statement is corroborated. State v. Cobb, supra. This court has noted that before such prior statements can be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the facts sought to be proved by these prior inconsistent statements. State v. Rankin, 42,412 (La.App.2d Cir.9/19/07), 965 So.2d 946.
Uncorroborated hearsay evidence in the form of an out-of-court statement by a witness who later denies its truth, is not alone sufficient to sustain a criminal conviction. State v. Cobb, supra. Thus, if there were no objections to the use of prior inconsistent statements during trial, and it is impossible to tell whether those prior inconsistent statements were introduced for impeachment purposes or for their assertive value, an attorney's failure to object does not prohibit review of the use of the prior inconsistent statement on appeal. State v. Rankin, supra.
During the defendant’s trial in the present case, P.B. reaffirmed her statement to the Gingerbread House interviewer that defendant had reached under her pants and touched her private area with his hand. However; P.B. claimed at trial that any touching by defendant was accidental. Under Louisiana law, P.B.’s statement during the Gingerbread House interview is a prior inconsistent statement. Because P.B.’s Gingerbread House interview latmay have been admitted for both substantive and impeachment purposes, a reviewing court should address the admission of the prior statement even in the absence of an objection during trial.
Pursuant to Article 801(D)(1)(a), in order to admit P.B.’s Gingerbread House interview for its substantive purpose, there must be “additional evidence to corroborate” P.B.’s recanted statement.- Other than P.B.’s statement in her Gingerbread House interview, the record contains: (a) the testimony of Jennifer Flippo, who summarized P.B.’s statement during her Gingerbread House interview; (b) H.R.’s statement in her Gingerbread House interview that H.R.’s aunt told her that defendant did “other stuff’ to P.B.; and (c) B.B.’s recanted statement in her Gingerbread House interview that P.B. told B.B. that defendant “picked [her] up like that” as well. The record shows that Flippo’s testimony does not provide the fact-finder with any information that was not previously heard in the Gingerbread House interviews or the victims’ testimony; H.R.’s statement is vague and lacks any specificity; and B.B.’s statement, in addition to having been recanted, also lacks any specificity or detail.
Because the statements listed above do not provide 'the type of corroboration required by Article 801(D), we find that the trial court erred in admitting P.B.’s Gingerbread House interview for its assertive value. While the jury may make a credibility determination as to the truthfulness of witnesses’ statements, a jury may not weigh testimony, which is inadmissible for its assertive value, against admissible testimony. Because P.B.’s recanted Gingerbread House interview was the sole substantive | ^evidence of defendant’s guilt relative to his conviction for indecent behavior with P.B., we must reverse defendant’s conviction and sentence for indecent behavior with a juvenile under the age of 13, P.B.
At some point before trial, B.B. recanted her allegation against the defendant made in her Gingerbread House interview. At trial, B.B. testified that defendant only wanted to hug her and that her allegation of inappropriate physical contact was a lie. B.B.’s recanted statement during the Gingerbread House interview is a prior inconsistent statement that must be corroborat *529 ed with other evidence to be admitted as nonhearsay. Other than B.B.’s statement in her Gingerbread House- interview, the record contains the testimony of Jennifer Flippo, who summarized B.B.’s statement during her Gingerbread House interview and H.R.’s statement in her Gingerbread House interview.that she heard the defendant had touched B.B. ,
For the same reasons discussed above regarding the defendant’s conviction for indecent behavior with P.B., the record lacks sufficient corroboration under. Article 801(D). Thus, the trial court erred in admitting B.B.’s Gingerbread House statement for its assertive value. Because B.B.’s recanted Gingerbread House interview was the sole substantive evidence showing that defendant was guilty of indecent behavior with B.B., we must reverse defendant’s conviction and sentence for indecent behavior with a juvenile, B.B.

Sentencing

The defendant contends the trial court erred in imposing an excessive sentence. Defendant argues that the 25-year mandatory minimum sentence |aRis abusively harsh because the practical result of the sentence would be life'imprisonment given defendant’s age and poor health. '
The trial court is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of this discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7. Where there is a mandatory sentence, there is no need for the trial court to justify, under LSA-C.Cr.P. art. 894.1, a sentence it is legally required to impose. State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35; State v. Koon, 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503. There is no requirement that specific matters be given any particular weight at sentencing. State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267; State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.9/28/07), 964 So.2d 351.
While the Louisiana Supreme Court has stated that courts have the power to declare a mandatory minimum sentence excessive under La. Const. Art. I, § 20, this power should only be exercised in rare cases and only when the court is firmly convinced that the minimum sentence is excessive. State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. A court may only depart below the mandatory minimum sentence if it finds clear and convincing evidence, in the particular case before it which would rebut the presumption of constitutionality. State v. Gay, 34,371 (La.App.2d Cir.4/4/01), 784 So.2d 714. The defendant bears the burden of showing that a deviation beneath the mandatory minimum is warranted. State v. Stevens, 33,700 (La.App.2d Cir.8/23/00), 766 So.2d 634. The defendant must make a showing that his circumstances are “exceptional” — that lie is a victim of the legislature’s failure "to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Robbins, 43,240 (La.App.2d Cir.6/4/08), 986 So,2d 828, writ denied, 2008-1438 (La.2/20/09), 1 So.3d 494. The fact that a defendant is in poor health is not sufficient evidence to support a deviation from the mandatory minimum statutory sentence or to find that the lower court abused its discretion in sentencing a defendant within the statutory limits. State v. Free, 48,260 (La.App.2d Cir. 11/20/13), 127 So.3d 956, *530 writ denied, 2013-2978 (La.5/30/14), 140 So.3d 1174.
Whoever commits the crime of molestation of a juvenile under the age of 13 shall be imprisoned at hard labor for not less than 25 years nor more than 99 years. At least 25 years of the sentence shall be served without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:81.2(D).
In this case, the 25-year sentence without benefits imposed for molestation of a juvenile under the age of 13, H.R., is the mandatory minimum sentence under the statute of conviction; Although defendant received the mandatory minimum sentence and consideration of the Article 894.1 guidelines was unnecessary, the trial court noiietheless conducted a | ^thoughtful analysis of the sentencing factors outlined in that article. The record indicates that the trial court considered defendant’s age, health, lack of criminal history, and the statements and trial testimony of the victims.
Neither .the Louisiana legislature nor the jurisprudence indicates that a sentence that would potentially last for the lifetime of a defendant is determinative of an “exceptional” circumstance for which a judge should depart from the mandatory minimum sentence. Rather, Louisiana jurisprudence suggests that a defendant’s age, poor health and limited criminal record, viewed in light of the facts and circumstances surrounding the crime for which the defendant was convicted, do not render a defendant per se “exceptional.” State v. Foley, 456 So.2d 979 (La.1984); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641.
In imposing sentence, the trial court found that the statutory mandatory minimum sentence is constitutional as applied to this defendant given the profound harm caused to the victim. .Based on the evidence presented, the record supports the trial court’s finding that defendant failed to demonstrate that he was exceptional and entitled to a deviation from the mandatory minimum sentence. Thus, the trial court did not abuse its discretion in imposing the mandatory 25-year sentence for the offense of conviction. Consequently, we cannot say the sentence imposed is constitutionally excessive. The assignment of error lacks merit.
As discussed above, the defendant’s convictions of indecent behavior with the juveniles P.B. and B.B. are reversed. Thus, the sentences imposed for those offenses shall be vacated.
| ¿^Supplemental Brief
In his untimely supplemental pro se brief, the defendant contends his trial counsel was ineffective. Defendant argues that he was denied a fair trial because his attorney visited him in jail only a few times, did not allow him to review the recordings of certain witness interviews and prevented him'from fully testifying in his own defense.
The Sixth Amendment to the U.S. Constitution mandates the right of a defendant in a criminal proceeding to effective assistance of counsel. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail under Strickland, supra, the defendant first must show that counsel made errors so serious that his performance was deficient. Second, he must show that counsel’s deficient performance prejudiced his defense.
Generally, a claim of ineffective assistance of counsel is more properly *531 raised in an application for post-conviction relief (PCR) in the trial court than by appeal. This is because PCR provides the opportunity for a'full evidentiary hearing under LSA-C.Cr.P. art. 930. State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial'economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
The record shows that defendant received notice of the deadline for |30filing a supplemental brief if he so chose, but did not file his pro se brief until January 25, 2016, more than three months past the applicable filing deadline. Defendant did ■not offer any explanation for this failure.
In any event, the defendant’s claims of ineffective assistance of counsel are more properly raised in a PCR application filed in the district court than on appeal. Defendant’s specific ineffective assistance claims cannot, be resolved .based on the record before this court. Thus, the remedies available under the PCR standards are more appropriate. State v. Ellis, supra; LSA-C.Cr.P. arts. 928, 929, 930.

Error Patent

A review of the record shows that the trial court did not properly inform the defendant of the sex offender notification and registration requirements outlined in LSA-R.S. 15:542-543.1/ At all relevant times, molestation of a juvenile has been defined as a sex offense by LSA-R.S. 15:541. There being no indication in the record as to whether defendant is aware of the sex offender registration requirements, we remand this matter to the trial court for the purpose of providing the appropriate written notice to the defendant of the sex offender registration requirements and for the filing of written proof of such notice in the record of the proceedings. State v. Williams, 49,249 (La.App.2d Cir.10/1/14), 149 So.3d 462, writ denied, 2014-2130 (La.5/22/15), 173 So.3d 1167; State v. Scott, 42,997 (La.App.2d Cir.2/13/08), 975 So.2d 782.
CONCLUSION
For the foregoing reasons, the defendant’s conviction and sentence | 31for molestation of a juvenile under the. age of 13 are affirmed'. Defendant’s convictions for indecent behavior with a juvenile under the age of 13, P.B., and indecent behavior with a juvenile^ B.B., are reversed and the sentences imposed for those offenses are vacated.' This matter is remanded to the trial court with instructions to provide the defendant' with appropriate written notice of his sex offender registration obligations in compliance with LSA-R.S. 15:542-543.1 and for the filing of written proof thereof in the record.
CONVICTION AND SENTENCE FOR MOLESTATION OF A JUVENILE UNDER THE AGE OF 13 AFFIRMED;. CONVICTIONS FOR INDECENT' BEHAVIOR WITH A JUVENILE UNDER THE AGE OF 13 AND INDECENT BEHAVIOR WITH A JUVENILE REVERSED AND SENTENCES VACATED; REMANDED WITH INSTRUCTIONS.

. Because this case involves juveniles, the initials of the minors will be used in this opin *518 ion. LSA-R.S. 46:1844(W).