WILLIAMS, C.J.
The defendant, James Hardy[1] Pitman, was charged by bill of information with molestation of a juvenile, in violation of La. R.S. 14:81.2(A)(1). Following a bench trial, the defendant was found guilty as charged. Thereafter, the defendant was sentenced to serve 45 years at hard labor, with the first 25 years to be served without the benefit of parole, probation or suspension of sentence. For the following reasons, we affirm.
FACTS
The defendant, James Pitman, and B.S.[2] were married in 2002; they had a child, *492 I.P., in 2005.[3] The family lived together in a mobile home in Keithville, Louisiana, until the defendant and B.S. separated in 2010. At that time, B.S. and I.P. moved to an apartment in Shreveport, and the defendant relocated to another mobile home park in Caddo Parish. Following her parents' separation, I.P. would visit the defendant at his mobile home; some of the visits were overnight. At times, the defendant would spend the night with B.S. and I.P. at their apartment while the couple attempted to reconcile.
In December 2014, B.S. filed a petition for divorce after she discovered that the defendant had been unfaithful to her. Soon thereafter, I.P. confided to B.S. that the defendant had sexually abused her on multiple occasions when she was younger.
On December 5, 2014, B.S. took I.P. to the Gingerbread House, a children's advocacy center in Shreveport, for a previously scheduled appointment.[4] At the behest of the staff of the Gingerbread House, B.S. contacted the Shreveport Police Department and reported the molestation. Thereafter, the matter was referred to the Caddo Parish Sheriff's Office. Detective Jared Marshall arranged for I.P. to be interviewed by a forensic interviewer at the Gingerbread House. During the interview, I.P. detailed various sexual acts committed upon her by the defendant, beginning when she was three years old and ending when she was six years old. More specifically, I.P. stated as follows: the defendant would force her to "rub" his penis; the defendant would use his hands to "rub" her genital area; the defendant had penetrated her vagina with his penis; and the defendant had taken photographs of her genital area.
On January 5, 2015, the defendant was charged by bill of information with one count of molestation of a juvenile under the age of 13, in violation of La. R.S. 14:81.2. The bill of information alleged that the offense was committed in Caddo Parish between 2009 and 2014.
A bench trial commenced on November 9, 2016. Det. Marshall testified that during the course of the investigation, he interviewed B.S. and I.P., and he arranged for I.P. to undergo a forensic interview. He further stated that he observed the interview, during which I.P. detailed the sexual interactions between her and the defendant. On cross-examination, Det. Marshall testified that he interviewed at least two people with young children with whom the defendant had contact. Det. Marshall stated that there was no indication that the other children had been the victims of any *493 inappropriate behavior involving the defendant. Further, Det. Marshall testified that B.S. reported to him that, in the past, she had asked I.P. about sexual abuse on several occasions and I.P. denied any abuse.
I.P., who was ten years old, testified at the trial. During her testimony, I.P. identified her 2014 Gingerbread House interview, which was played in open court.[5] The video recording depicted I.P. as she described several acts of sexual abuse by the defendant, beginning when she was three years old, and ending when she was six years old. According to I.P., the defendant touched her inappropriately at three different locations: (1) the "old house" in Keithville where she lived with the defendant and her mother; (2) the defendant's mobile home in Keithville; and (3) the apartment in Shreveport where I.P. lived with her mother. I.P. stated that the defendant would remove his clothes and force her to grab him "down there." She also reported that the defendant attempted to kiss her on her mouth. Further, I.P. stated that the defendant would order her to lie on top of him, while both of them were naked, and instruct her "to move up and down." According to I.P., the acts she described occurred at all three residences.
Additionally, during the interview, I.P. disclosed the following: when she was "five or six" years old, and the family was living at the mobile home park in Keithville, the defendant inserted the tip of his penis into her vagina; the defendant took photographs of her vagina and forced her to watch videos that contained "sexual" material; during one incident at her mother's apartment, the defendant instructed her to "sit in front of him" while they were both naked; on another occasion, the defendant forced her to rub his penis with "clear gel" and instructed her to put her mouth "down there" but she refused to do so; the defendant warned her not to tell "mommy or anybody" about the sexual acts; and she "felt safe" telling her mother about the abuse after her mother filed the petition for divorce.
After the video of the Gingerbread House interview was played, I.P. verified that she told the truth during the interview. She also testified that she did not tell her mother about the ongoing abuse because she was scared the defendant "would try to hurt [her]." Further, I.P. testified that she "does not like to talk about" the sexual abuse and that it was difficult for her to testify regarding the abuse.
During cross-examination, I.P. testified that prior to his arrest, she enjoyed doing things with the defendant, such as Judo, playing, and watching television. I.P. also identified a Father's Day card she sent to the defendant after he was arrested for the molestation.[6]
Jennifer Flippo, a forensic interviewer at the Gingerbread House, testified that she conducted I.P.'s interview on December 5, 2014. Flippo was accepted by the trial court as an expert in "the field of forensic interviewing and in the field of child abuse dynamics."[7]
Flippo testified that during her interview with I.P., the child exhibited the following *494 behaviors when she began discussing the sexual abuse committed by her father: her head dropped, she spoke softly and mumbled, and she avoided maintaining eye contact. Flippo explained that I.P.'s behavior was common and indicated "embarrassment or fear." According to Flippo, I.P. recalled different episodes of abuse based upon where she was living at the time because children generally have difficulty quantifying time and often use events as a point of reference. Flippo opined that I.P.'s disclosure of the sexual abuse was not related to the custody dispute between her parents because I.P.'s descriptions of the acts of abuse were "very detailed" and did not appear to be memorized or scripted. Further, Flippo testified that it is common for an abused child to keep in contact with her abuser after the abuse ends. Flippo also stated that it was not unusual that I.P. did not disclose the abuse during her 2012 interview at the Gingerbread House because sometimes, children are not "emotionally ready" to disclose abuse "until they feel safe" to do so.
B.S. testified as follows: she, the defendant and I.P. lived in Keithville until 2010, when she left the defendant and moved to an apartment in Shreveport; she filed for divorce in January 2014, when she learned that the defendant was having an affair; after the separation, the defendant moved to a mobile home located in a trailer park in Shreveport; I.P. would sometimes stay overnight with the defendant; occasionally, she and the defendant would spend the night at each other's residences; she noticed that I.P. would sometimes cry and complain that she did not want to stay overnight with the defendant; the defendant had supervision over I.P. when she stayed overnight with him; occasionally, her job as a kennel manager required her to leave the house for "an hour or so" on the weekends; the defendant would stay with I.P. while she worked on weekends; when she and the defendant were married, her younger cousin, T.Y., would stay overnight at their house; at the time, T.Y. was "12 or 13" years old; on one occasion, she saw T.Y. and the defendant sitting on a sofa together with a blanket covering their laps; and she had never threatened the defendant.
T.Y. testified as follows: when she was younger, she would sometimes stay overnight with B.S. and the defendant at their home in Keithville; one night, when she was "around seven years old," the defendant forced her to touch his penis; the incident occurred when B.S. was asleep; on another occasion, when she was "around 17 or 18," the defendant inserted his finger into her anus; she told the defendant to stop his actions, but he refused to do so; the defendant threatened to harm B.S. if T.Y. told anyone about the incident; and she left the defendant's home the day after the incident and never stayed overnight at the home again.[8]
On cross-examination, T.Y. acknowledged that in 2012, she called the defendant and asked him to pick her up from a party. She stated that the defendant picked her up from the party and drove her home without incident.
Nicole Avise-Brownell, the defendant's friend, also testified. She stated that the defendant often stayed at her home when her children were present. She also testified that the defendant had never behaved inappropriately with her children.
Paula Pitman, the defendant's mother, testified as follows: the defendant and B.S. had "marital problems" and had separated several times prior to their divorce; before *495 the defendant was arrested, she would often supervise visits between him and I.P.; during the visitations, I.P. was "always excited" to see the defendant; and after B.S. filed the petition for divorce, she threatened to "make [the defendant] pay."
Rex Pitman, the defendant's father, testified that he had observed the defendant and I.P. playing together and practicing martial arts. He corroborated his wife's testimony that B.S. had threatened "to make [the defendant] pay."[9]
The defendant also testified at trial and acknowledged his alcoholism and its effect on his marriage and his ability to parent. The defendant stated that he and I.P. had a "good relationship." The defendant corroborated B.S.'s testimony with regard to the different places they had lived, both during the marriage and after the separation. However, the defendant testified that he and I.P. often accompanied B.S. to the kennel when she had to work on weekends and that he rarely stayed alone with I.P. The defendant also denied inappropriately touching either I.P. or T.Y. According to the defendant, after the car-washing incident in 2012, B.S. threatened him by stating, "Now I know how I can get you if you make me angry." The defendant acknowledged that he had several criminal convictions, including convictions for simple battery, violation of a protective order, domestic abuse battery (of B.S.), and simple resisting arrest.
After hearing the testimony and reviewing the evidence, the trial court found the defendant guilty as charged of molestation of a juvenile. The court noted I.P.'s credibility with regard to her testimony at trial and her interview at the Gingerbread House. Subsequently, the trial court denied the defendant's motions for new trial and post-verdict judgment of acquittal. The defendant was sentenced to 45 years' imprisonment at hard labor, with the first 25 years to be served without the benefit of probation, parole or suspension of sentence.
The defendant now appeals.
DISCUSSION
The defendant contends the evidence was insufficient to support his conviction for molestation of a juvenile. He argues that the testimony of the witnesses was "internally contradictory" and irreconcilable. He also argues that several witnesses testified that B.S. had threatened to "make him pay." The defendant also notes I.P.'s "late disclosure" of the sexual abuse and her failure to disclose the allegations during her 2012 interview at the Gingerbread House. Further, according to the defendant, T.Y.'s testimony that he sexually abused her was not credible.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
*496 State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 1996-1048 (La. 10/4/96), 680 So.2d 1165.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Wilson , 50,418 (La. App. 2 Cir. 4/6/16), 189 So.3d 513, writ denied , 2016-0793 (La. 4/13/17), 218 So.3d 629.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher , 41,981 (La. App. 2 Cir. 5/9/07), 956 So.2d 769 ; State v. Burd , 40,480 (La. App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied , 2006-1083 (La. 11/9/06), 941 So.2d 35. Likewise, the sole testimony of a sexual assault victim is sufficient to support a requisite factual finding. State v. Wilson , supra. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Ponsell , 33,543 (La. App. 2 Cir. 8/23/00), 766 So.2d 678.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied , 2002-2595 (La. 3/28/03), 840 So.2d 566, 2002-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442.
The trier of fact is charged to make credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Credibility determinations are the province of the trier of fact. State v. Johnson , 38,927 (La. App. 2 Cir. 11/23/04), 887 So.2d 751 ; State v. Powell , 27,959 (La. App. 2 Cir. 4/12/96), 677 So.2d 1008, writ denied , 1996-1807 (La. 2/21/97), 688 So.2d 520.
La. R.S. 14:81.2[10] provides, in pertinent part:
A. (1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or *497 by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
In the instant case, it is undisputed that at the time of the offense, I.P. was under the age of 13, the defendant was over the age of 17, and the age difference between I.P. and the defendant was more than two years. It is also undisputed that the defendant, as I.P's father, was in a position of supervision or control over her.
The evidence of record reveals that during her Gingerbread House interview, I.P. stated that the defendant performed various sexual acts with her from the time she was three years old until she turned six years old. Specifically, I.P. stated that the defendant touched her genitals, required her to touch his genitals, inserted his penis into her vagina, and forced her to lie on top of him naked while he moved her body "up and down." I.P.'s description of those acts, including the time and location of the sexual abuse, was detailed and consistent. At trial, I.P. verified that the statements she made during her Gingerbread House interview were truthful.
Additionally, I.P.'s description of where she lived during different periods of time (which assisted her in recalling specific acts of sexual abuse) was corroborated by the testimony of B.S. and the defendant. B.S. testified that the defendant would spend time alone with I.P. when they still lived together, and later at his mobile home and her apartment after they separated. The defendant's testimony further corroborated the living arrangements of the family, although he denied any wrongdoing.
In finding that the defendant was guilty of the crime, the trial court stated:
The Court then had to decide and determine who was most credible, who does the Court believe. Ultimately, the Court believes that I.P. would not fabricate these charges unless induced to do so by an adult. The Court believes that the timeline does not suggest to the Court that it is rational to believe that [B.S.] would coach I.P. to do [so].
* * *
The Court does not find the timeline is consistent with allegations of fabrication. It is not consistent with allegations of coaching or an impure or a prurient motive in making these allegations. And, therefore, the Court believes that I.P. deserves to be believed, as she was an entirely credible witness.
After reviewing this record in its entirety, we find the evidence was sufficient to prove that the defendant committed the offense of molestation of a juvenile under the age of 13. I.P.'s testimony, including her statements during her interview at the Gingerbread House, was detailed and consistent, and it did not conflict with any physical evidence. Based upon the testimony of the victim alone, the trial court could reasonably have found that the state proved the essential elements of the crime of molestation of a juvenile beyond a reasonable doubt. Thus, under the Jackson standard, the evidence presented was sufficient to support the defendant's conviction for molestation of a juvenile under the age of 13. The trial court, the factfinder in this case, reasonably accepted I.P.'s testimony as credible and rejected the defendant's denials of wrongdoing. This assignment of error is without merit.
ERRORS PATENT
In accordance with La. C. Cr. P. art. 920, all appeals are reviewed for errors patent on the face of the record. A review of the record herein reveals one error.
The record reveals that the trial court denied the defendant's motions for new *498 trial and post-verdict judgment of acquittal in open court on July 18, 2017, the day the sentence was imposed. There is no indication in the record that the defendant expressly waived the sentencing delay.
La. C. Cr. P. art. 873 provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
When the defendant makes no showing of prejudice, the trial court's failure to observe La. C. Cr. P. art. 873 is a harmless error, and there is no need to remand for resentencing. State v. Sermons , 41,746 (La. App. 2 Cir. 2/28/07), 953 So.2d 958, writ denied , 2007-0789 (La. 11/2/07), 966 So.2d 601 ; State v. Moossy , 40,566 (La. App. 2 Cir. 3/10/06), 924 So.2d 485.
In this case, the defendant did not object to the trial court's failure to observe the delay and did not raise the issue on appeal. Upon denying the defendant's motions, the trial court noted the defendant's objection to its ruling and proceeded with sentencing. After hearing the testimony of two defense witnesses, the trial court inquired, "Any argument by either side?" Defense counsel responded by asking the court to consider factors such as the defendant's age, the age of his parents, the hardship to his family and the health of his parents.
Our review of the record reveals no showing of prejudice to the defendant. Thus, the trial court's failure to observe the statutory requirement with regard to sentencing delays was harmless error.
CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.

At trial, the defendant spelled his middle name "Hardie." However, it is spelled "Hardy" throughout the remainder of the record.

The victim in this matter will be referred to by her initials for confidentiality purposes in accordance with La. R.S. 46:1844(W). Additionally, when possible, the relatives, whose identities could aid in the identification of the victim, will be referred to either by their initials or by their relation to the victim.

I.P.'s date of birth is November 23, 2005.

I.P. was undergoing counseling at the Gingerbread House as a result of a complaint made by some employees at an apartment complex. According to the record, the employees reported that I.P. was washing the defendant's car "in a provocative manner," while the defendant was videotaping her. During the 2012 Gingerbread House interview, I.P. related that the defendant would "get drunk" and "curse" and fight her mother. However, I.P. did not disclose that the defendant was sexually abusive toward her. The defendant was never charged with any crime stemming from the "car-washing" incident.
With regard to that incident, B.S. testified as follows: the defendant and I.P. were washing the defendant's car; the defendant began videotaping I.P.; some employees at the apartment complex thought the behavior was sexually provocative and called law enforcement; the police department investigated the incident and no charges were filed; at that time, she did not suspect that the defendant had done anything inappropriate to I.P.; and took I.P. to counseling at the Gingerbread House following that incident.

The trial court had previously conducted a "Gingerbread hearing" on July 16, 2015. Following that hearing, the court ruled that the video recording of I.P.'s 2014 Gingerbread House interview was admissible. The video was admitted into evidence as State's Exhibit # 1.

The Father's Day card was admitted into evidence as a defense exhibit.

Flippo stated that she has a bachelor's degree in psychology, a master's degree in "counseling psychology," and she had been employed at the Gingerbread House for approximately 15 years.

The defendant was not convicted of any crime with regard to the allegations made by T.Y. Therefore, those allegations are not at issue in this appeal.

Christina Leigh Hendricks, the defendant's childhood friend, testified that B.S. sent her a message on Facebook threatening to "put [the defendant] in jail." However, the message, which was read by the trial court, actually stated that the defendant had been arrested and charged with domestic abuse battery, assault and resisting arrest.

La. R.S. 14:81.2 was amended during the period of time during which the defendant molested I.P. (between 2009 and 2014). However, the definition of the offense and penalty have remained the same.