Judgment rendered March 5, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,185-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

JAMES RUSSEL JOHNSON, JR.           Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 246,920

Honorable Michael E. Nerren, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Peggy J. Sullivan

J. SCHUYLER MARVIN                          Counsel for Appellee
District Attorney

RICHARD R. RAY
CHRISTOPHER WARREN
Assistant District Attorneys

* * * * *

Before STONE, COX, and STEPHENS, JJ.

**STEPHENS, J.**

This criminal appeal arises out of the 26th Judicial District Court, Parish of Bossier, State of Louisiana, the Honorable Michael E. Nerren, Judge, presiding. The defendant, James Russell Johnson, Jr. (hereinafter referred to as Johnson or Russell),[1] was found by a six-person jury to be guilty as charged of molestation of a juvenile, a violation of La. R.S. 14:81.2(A)(1) and (B)(2), and sentenced by the trial court to seven years' imprisonment at hard labor. Johnson has appealed from his conviction. For the reasons set forth below, the defendant's conviction and sentence are affirmed.

## PROCEDURAL BACKGROUND

The defendant, James Russell Johnson, Jr., was charged by bill of information on February 12, 2023, amended on February 6, 2024, with molestation of a juvenile in violation of La. R.S. 14:81.2(A)(1) and (B)(2),[2] as follows:

> James Russel Johnson, Jr., on or about November 22, 2022, being a person over the age of seventeen, did commit any lewd or lascivious act upon the person or in the presence of any child when the victim is thirteen years of age or older but has not yet attained the age of seventeen, and when the offender has control or supervision over the juvenile, namely: H.M. (D.O.B. 10/29/2008), with the intention of arousing or gratifying the sexual desires of either person by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile.

---

[1] The defendant's middle name is misspelled throughout the record as "Russel."

[2] Subsection (B)(2) of La. R.S. 14:81.2 was amended by Acts 2024, No. 597, § 1 to increase the term of imprisonment, with or without hard labor, that can be imposed under this section to not less than ten years nor more than twenty years. At the time of the offense in question, however, subsection (B)(1) provided for a term of imprisonment, with or without hard labor, of not less than five years nor more than twenty years.

During a session with her therapist in February 2023, H.M. disclosed the incident, and an investigation began immediately upon the counselor's report of the allegations. H.M. was interviewed by a forensic interviewer at the Gingerbread House Child Advocacy Center. Johnson was interviewed by detectives with the Bossier Parish Sheriff's Office and, after having been read his *Miranda* rights, he admitted to drinking heavily one night and providing H.M. with alcohol until she was "too intoxicated." He also stated that he slept in the bed with her. Johnson claimed to have no memory of inappropriate contact with the young victim. He also told the detectives of allegedly similar incidents involving females in which he had been drinking that had occurred in the weeks prior to the incident under investigation.

On February 26, 2024, Johnson's trial began with a hearing to address several motions. His motion to recuse the judge was denied, then the court heard testimony on the issue of whether the defendant's statement to officers was free and voluntary. The trial court found the interview given by Johnson to be admissible.[3] The admissibility of the victim's Gingerbread House interview had previously been determined.[4] Jury selection began the following day, and on February 29, 2024, a unanimous jury found the defendant guilty of molestation of a juvenile. The trial court ordered a pre-sentence investigation ("PSI") report, and Johnson was sentenced on May 28, 2024, to seven years' imprisonment at hard labor. In this appeal, the defendant has challenged his conviction, urging that the evidence was insufficient to support his conviction and that the trial court erred in

---

[3] This information was gleaned from the trial court's minutes of February 26, 2024. The appellate record does not contain a transcript from February 26, 2024.

[4] This information comes from the trial court's minutes of August 15, 2023.

2

allowing into evidence testimony of other crimes, wrongs, or acts that did not fall within the exceptions set forth in La. C. Cr. P. arts. 404(B) or 412.2.

## DISCUSSION

### Sufficiency of the Evidence

The defendant first contends that the State failed to prove by a sufficiency of the evidence that he was guilty of molestation of a juvenile. In support, he notes that there was no physical evidence in this case, only the testimony of the alleged victim, H.M. The State failed to introduce any evidence of threats, force, or violence. This meant that the State had to prove that Johnson had supervision and control over H.M.

According to Johnson, there was no testimony that H.M. spent any significant amount of time with him. Their "relationship" existed through his status as the former stepfather of her friend O.H. While Johnson was an adult, there was no testimony that he had any authority to discipline H.M. The only thing that could "suggest authority" would be his age, urges the defendant. H.M. did not testify that she was afraid of him, felt threatened by him, or was concerned about any repercussions based on her reaction to him. It is the defendant's position that the evidence does not support that the State established all of the essential elements of molestation of a juvenile under La. R.S. 14:81.2(A)(1) and (B)(2) beyond a reasonable doubt.

The State asserts that the record contains sufficient evidence to support a conviction of molestation of a juvenile beyond a reasonable doubt. The basis for the charges against the defendant was H.M.'s report to her therapist that Johnson supplied her with alcohol, she became intoxicated, and he got into the bed in which she had been sleeping, where he inappropriately touched her genitals.

3

In his interview with Bossier Parish Sheriff's Office detectives, Johnson admitted to all of the above, except that he claimed to have no memory of touching H.M.'s genitals. However, the defendant did admit to other similar acts with adult females which had occurred in the days and weeks prior to the incident involving the teen victim in this case. As he related to the detectives, in these other incidents, Johnson was told that when he became highly intoxicated, he had acted inappropriately by grabbing the genitals of other adult women without their consent. He told the officers that he had "blacked out" and did not remember the contact that occurred when he had been drinking.

The State further points out that at trial, the jury heard testimony from the victim, H.M., and the defendant's stepdaughter that they both trusted him. There was also testimony that H.M. reported to her friend O.M., the defendant's stepdaughter, the morning after the incident what had happened and told her counselor in a session two months later. Both H.M.'s therapist and Jordan Hughes, the forensic interviewer from the Gingerbread House, testified at trial that delayed disclosure is not uncommon with child victims. H.M.'s trial testimony was consistent with her statements to the forensic interviewer, as contrasted with that of Johnson, whose testimony was inconsistent with statements he made in his prior interview with detectives.

The State urges that the jury heard testimony that Johnson was the adult responsible for the girls the night of the incident. They also heard the defendant say that H.M. asked for alcohol in an attempt to shift the blame for what happened onto her. However, in his interview with the detectives, Johnson said that he needed to apologize to H.M. The jury clearly had

4

sufficient evidence from which it could discount the defendant's self-serving testimony and find credible the testimony of the young victim.

### *Applicable Legal Principles*

Under the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 443 U.S. at 319, 99 S. Ct. at 2789; *State v. Stockstill*, 19-01235, p. 4 (La. 10/20/20), 341 So. 3d 502, 505-06. This standard, now codified in La. C. Cr. P. art. 821, does not afford an appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Instead, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, and 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed. 2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Coffey*, 54,729 (La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La.

5

12/20/22), 352 So. 3d 89; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629.

The essential elements of the crime of molestation of a juvenile, each of which the prosecution must prove beyond a reasonable doubt, are: (1) the accused was over the age of 17; (2) the accused committed a lewd or lascivious act upon the person of or in the presence of a child under the age of 17; (3) the accused was more than two years older than the victim; (4) the accused had the specific intent to arouse or gratify either the child's sexual desires or his or her own sexual desires; and (5) the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2(A)(1); *State v. LeBlanc*, 506 So. 2d 1197 (La. 1987); *State v. Lewis*, 52,367 (La. App. 2 Cir. 11/14/18), 260 So. 3d 1220; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629; *State v. Terry*, 47,425 (La. App. 2 Cir. 11/21/12), 108 So. 3d 126, *writ denied*, 12-2759 (La. 6/28/13), 118 So. 3d 126.

It is uncontested that, at the time of the offense, H.M. was only 13 years old, and there was an age difference of more than two years between her and Johnson, the ex-stepfather of her close friend. The only issues, as raised by the defendant's assignments of error, are whether the evidence established that his conduct was lewd and lascivious and whether he had a position of supervision or control over H.M.

A lewd or lascivious act is one which tends to excite lust and to deprave morals with respect to sexual relations and which is indecent. *State v. Hernandez*, 55,256 (La. App. 2 Cir. 8/9/23), 369 So. 3d 962; *State v.*

*Coffey*, 54,729 (La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La. 12/20/22), 352 So. 3d 89; *State v. Redfearn*, 44,709 (La. App. 2 Cir. 9/23/09), 22 So. 3d 1078, *writ denied*, 09-2206 (La. 4/9/10), 31 So. 3d 381.

The meaning of the phrase "influence by virtue of a position of control or supervision" in La. R.S. 14:81.2 is not restricted in its application to persons to whom the parent entrusts the child for care, such as babysitters, childcare workers, or teachers. *Id.* La. R.S. 14:81.2 permits finding evidence of supervision or control by noncustodial parents, relatives, friends, and neighbors of young victims. *Id.* Louisiana courts consider the following factors when determining whether a defendant used influence by virtue of his position of supervision or control over the victim: (1) the amount of time the defendant spent alone with the victim; (2) the nature of the relationship between the victim and the defendant; (3) the defendant's age; and (4) the defendant's authority to discipline. *Id.*

### *Trial Testimony/Evidence*

### Jordan Hughes

Both H.M., the victim, and her best friend, O.H., were interviewed separately on different dates by Jordan Hughes, a forensic interviewer with the Gingerbread House in Shreveport, Louisiana. The interviews were videotaped and played in the courtroom for the jury during Ms. Hughes' testimony.

***Summary of Interviews of H.M. and O.H.***[5]

On the night of the incident, H.M. was at her best friend O.H.'s house. O.H.'s mother J.P. is Russell's ex-wife.[6] Russell and J.P. are the parents of D.J., O.H.'s younger sister. Russell and J.P. got a divorce because he was an alcoholic and haven't been together "for a really long time," maybe since O.H. was nine years old.

On fall break, H.M. and O.H. planned to go where Russell was living at the time (at the ex-father-in-law's house) so they could go hunting and "hang out." According to H.M., it wasn't like "some random guy they were going to hang out with." O.H. considers Russell to be like her father.

The weekend of Thanksgiving, she and O.H. were at O.H.'s house helping her mom put up and decorate the tree. They went to the store with Johnson to get something else for the tree. After that, they went to look for more beer. Russell got some Seagram's and two 24-packs of Bud Light. They went back to O.H.'s house. O.H. and H.M. got their stuff, put it in Russell's van, and they left. Halfway to the property, Russell told H.M. she could start drinking if she wanted.

There were three bedrooms in the house. The owner and his girlfriend had one. The second one was full of boxes, and Russell, H.M., and O.H. had the third one. H.M. and O.H. went into the bedroom where their stuff was. H.M. was still drinking. She "chugged" her fifth Seagram's, and was "pretty drunk" at this point. She got another one, took a sip of it, and put it down.

---

[5] The trial testimony of both H.M. and O.H. was consistent with the information they gave in their Gingerbread House interviews, except that O.H. testified that she was untruthful about not drinking that night.

[6] Both H.M. and O.H. referred to Johnson as "Russell."

That's when H.M. fell off the bed and kicked over the drink, spilling it. Russell came back there and helped her onto the bed and told her she was cut off because she was obviously drunk. He cleaned up the drink. H.M. apologized, and Russell told her not to worry about it.

H.M. lay down because she didn't feel well. She had a water, which she sipped on, thinking it would help her, but it didn't. Russell came into the room, being loud, and that's when she threw up. Russell held the trash can for her when she threw up. She was sober enough to "text straight" and changed her clothes, getting ready to go to bed. She and O.H. were in the bed, and Russell was going to sleep on the floor.

O.H. told Russell he needed to sleep in the bed because he had a bad shoulder and back, and she would sleep on the floor. O.H. watched videos on TikTok on her phone, and H.M. tried to go to sleep, "balled up on the edge of the bed. That's when he grabbed me right here [pointing to her hip] and move[d] my body onto his. Um, I was kinda just in shock. I didn't know what to do. And then he takes my leg and … put it in between his and had my butt on him. And then he gets up to go get another beer, and that's when I snap a picture of a black screen on my phone on Snapchat and explain what's happening."

O.H. remembered Russell getting up in the middle of the night to go get another beer. Before that, she didn't hear anything. O.H. was still watching TikTok when Russell came back in the room and lay down. H.M. was still in the bed. O.H. didn't know whether H.M. was still asleep because she couldn't see her. O.H. heard Russell say something like, "Be still, you're moving too much."

9

H.M. told Ms. Hughes she had the picture saved in "For My Eyes Only" on her Snapchat App on her phone; H.M. then showed Ms. Hughes the pic on her phone screen, and read it to her, "he started by putting his leg i[n] between mine then he took his hand and grabbed my thigh and moved my ass onto his dick." H.M. also showed Ms. Hughes a saved pic of her and O.H., taken around midnight that night, which is close to the time she threw up. H.M. told Ms. Hughes she did not send the screenshot pic of her words to anyone, she just typed it and put into her "For My Eyes Only" file and put her phone down.

Russell came back and "he did the same thing as before," moved her body onto his and put her leg in between his. He then put his hand on her "no-no square," and she pushed it away. He put it back. She pushed his hand away again, and she "kinda like said, 'no, stop.'" Thirty seconds later, he was snoring. In response to a question from Ms. Hughes regarding Russell touching her "no-no" square the first time, H.M.'s response was that before he got up, he didn't do it. Her clothes stayed on the whole time; he never touched her bare skin. "He started to rub, and it took me a second or two to comprehend what was going on." When she pushed his hand away, he put it back and almost started to rub again, but she pushed it away again before he could.

H.M. didn't say no or stop or anything because she wanted Russell to think she was asleep. She did make a "sleepy type" noise to deter him or discourage him when she turned away and curled up into a ball. H.M. didn't think Russell had a shirt on, but he had his shorts on. When Ms. Hughes asked H.M. about the words she wrote in the Snapchat picture, H.M. told her

10

"It was kind of like he was spooning me … He had his right hand moving around on my hip and my butt."

H.M. related to Ms. Hughes that Russell woke up before them, and she and O.H. woke up around 10 or 10:30 a.m. He wasn't in the room when they woke up. O.H. felt that H.M. was acting "weird." That's when H.M. brought up the picture on her phone, showed it to O.H., and told her, "This happened last night." O.H. was confused at first by what H.M. showed her. H.M. couldn't remember exactly what O.H. said—something like "are you sure this happened?" O.H. believed her, she just wanted to be sure because it was not expected by either of them. "I didn't either. I know you don't expect it. I remember it. I typed it." According to H.M., by typing it, to her, that shows it happened. Her ability to do that, her awareness to type it at all, shows to her that it was real.

H.M. related that her mom found out about the incident from H.M.'s therapist Tammy Ewart. H.M. had been going through her "My Eyes Only" in Snapchat trying to find something and that's when she saw the picture she had saved that night. When she did tell Tammy, which was approximately three months after the incident, her therapist told her she had a duty to disclose, which included telling her mother. H.M. knew that was going to happen. She had told O.H. in advance she was going to disclose the incident because Russell is her ex-stepfather, and it was going to affect her family. H.M. told Ms. Hughes that she never sent out the screen shot she saved to Snapchat to anyone or told anyone else prior to telling her therapist Tammy.

Ms. Hughes asked H.M. whether anything like that had ever happened with Russell before. H.M. told Ms. Hughes that Russell had told "them" he went around at a concert just grabbing girls' butts. H.M. didn't know what

11

concert but "he was drunk again. It's like he's proud of it. He's telling us in front of his daughter in seventh grade, saying he was running round at the concert grabbing all these girls' butts and was scared he was going to get kicked out." H.M. also related another incident told by Russell to O.H., who told it to her. Russell was at a bar "doing the same thing." He was at a bar with a friend, who left him because he didn't want to get the police called on him for grabbing girls' butts.

O.H. told Ms. Hughes that nothing like that had ever happened to her, but she had not slept with Russell since she was eight years old. O.H. has never felt uncomfortable around Russell, but he does smoke weed and drink when he drives, so she doesn't really feel safe around him. She knew he had been drinking the night he came to pick them up because there was beer in the truck. Russell has a loud and goofy personality and is always really loud. He wasn't acting any different that night. According to O.H., Russell was definitely drunk "when he did it." She knows he drank a lot that night because she saw him. Also, when he was standing outside, he "literally like" fell off the side of the porch.

Ms. Hughes testified that during the interviews, she had an earpiece in. The detective was in the next room, observing what was going on, able to communicate if needed, and to propose questions. It was her job to gather the facts and information, talk to the two girls, and get their sides of what occurred. During H.M.'s interview, she made an active, delayed disclosure. It was delayed because it had happened some time before. H.M. had not previously been ready to talk, but in the interview room, she was. That is what makes the disclosure active. Ms. Hughes was not at all surprised that H.M. referred to her vagina as the "no-no square," although that is a phrase

more frequently used by younger ages. She was also not surprised by H.M.'s wording in her text screenshot.

**Detective Lamaro Ramey's Testimony**

Detective Ramey testified that after serving in the U.S. Marine Corps for 22 years, he joined the Bossier Parish Sheriff's Office. In 2023, he was working as a sex crimes investigator and was assigned to this investigation in February 2023. Based on information he received from the initial responding officer, which was disclosure of sexual abuse of a minor, he contacted the family. Det. Ramey introduced himself and talked to them about the next step in the process, which was a forensic interview at the Gingerbread House.

Det. Ramey told the jury that, in her interview with Ms. Hughes at the Gingerbread House, H.M. talked about the incident and made a disclosure. O.H. was also interviewed by Ms. Hughes. Based on his training and observation skills, Det. Ramey related that the two statements were corroborative. Based on the information he obtained, he secured an arrest warrant for the defendant for molestation of a juvenile. Det. Ramey contacted Johnson, who agreed to make a statement. Det. Ramey identified the videotaped interview as it began to play for the jury.

*Taped Interview of the Defendant*

Det. Ramey read Johnson his *Miranda* rights and had him sign a form that he understood and waived his rights. Det. Ramey then told Johnson the purpose of the interview—to talk about the evening of November 22, 2022. Johnson said he took O.H. and her friend to "hang out" at the place where he was staying at the time, which was a three-bedroom, three-bathroom house.

The three of them stayed in one room because one of the bedrooms had a "whole lot of shit" in it, and no one could sleep in it.

Johnson related that he was going to sleep on the floor, but O.H. told him to sleep on the bed because he was an old man. At that point, Johnson asked the detective, "Is that what this is about?" Det. Ramey asked, "Who did you sleep in the bed with?" Johnson responded, "Her friend. I didn't do nothing to that girl. Is that what this is about?" Det. Ramey, "Yeah, it's something like that. Let's … keep talking. We'll get everything … I'm gonna lay it all out for ya."

Johnson admitted to getting alcohol for the girls, a six-pack each. He told Det. Ramey he thought H.M. was 15 years old. Returning to the sleeping arrangements, Det. Ramey said, "So you slept with 'what's her name'?" Johnson said, "I only hung out with her once. I didn't sleep with her. I slept in the same bed as her, with my back turned to her."

Johnson didn't know how much H.M. had to drink. He said that she got sick, and he got a trash bag for her. The next day he woke up, felt uncomfortable, and went out and did some things in the yard. Returning the conversation to the previous night, Det. Ramey told Johnson that H.M. told him her back was to Johnson, who was behind her and facing her direction. When they were lying down, Johnson grabbed her hip and scooted her down "back on his dick." Johnson's response was, "Really." Det. Ramey continued, "She then said he grabbed my leg, put it between his leg, and started rubbing my vagina. She then said he got up, drank a beer, laid back down, and repeated the same thing."

Johnson said, "Do what now? I mean, I'm listening to you, but this is new to me." Det. Ramey asked Johnson whether he thought it was possible

14

that he was drunk to the point he didn't remember.  In the video, Johnson, who was leaning over, sitting with one hand over his mouth, shaking his head, stated, "Oh my God.  I mean.  I don't remember doing none of that.  I remember going to bed, and I passed out.  Now I will say this.  I was at a concert with my ex-girlfriend.  And I was black-out drunk, and I was rubbing on her friends' twats.  Nobody told me about that until, you know, two months later."  Det. Ramey told Johnson, "I've heard that story.  I heard it from [H.M.] too."

Johnson stated, "I get blackout drunk, and I don't know what I'm doing.  Like, I did it to my ex-father-in-law's girlfriend.  Like I got blackout drunk and didn't know" I was doing it.  Johnson said something about getting up and getting in bed with his father-in-law.  He's been in relationships for 17 years.  Had he done that, he might have rolled over and thought he was in bed with his ex-wife.[7]

Det. Ramey told Johnson that H.M. told O.H., and his ex-wife knows of the allegations.  Johnson told Det. Ramey he wants to call H.M. and apologize.  He is so, so sorry.  Det. Ramey told Johnson, "that is considered a lewd and lascivious act."  Johnson's response was, "I'm 100 percent in agreement with you."  Regarding timing of the two incidents Johnson told the detective about, the one involving his ex's friends at the concert was about a month or so before the instant offense, and the one involving his ex-

---

[7] At that point, as the videotape was playing the State's Attorney interjected, "All right.  I want—want to stop it here, because this sounds like the 'O.J. if I did it' situation.  Did I understand that right, he said if I had done it, then maybe I thought it was my ex-wife or ex-girlfriend in the bed with me?"  Defense Counsel objected, the A.D.A. withdrew his comment, a bench conference was held, and, at the request of both attorneys, the judge admonished the A.D.A. to leave his opinion and comments out of the trial.

father-in-law's girlfriend was on November 19 (three days before the incident).

**James Russell Johnson's Testimony**

The defendant took the stand in his own defense. He testified that he said he needed to call and apologize to H.M. during the interview because the detectives weren't asking him any questions—they were telling him what he had done. He didn't know what else to say.

Johnson knew about the other incidents he described during the interview where he had been drunk because people told him about it afterwards. He was with his friend, and they were just playing "grabass." He is still friends with those people, and no one has made any criminal accusations against him about that. He denied being a "groomer." He did not buy alcohol for those girls with the intention of taking advantage of one of them. He didn't take them to where he was living with the intention of taking advantage of them and didn't go into the room and get in the bed that night intending to touch or take advantage of one of them. Finally, Johnson said that he didn't touch H.M. inappropriately or make any sexual advances towards her. He knows this because he was not near her at all that night, only when he went to bed.

On cross-examination, Johnson said that his statement to detectives was 100% true. He immediately fell asleep when he got into the bed after having had a significant amount to drink. He admitted to saying in his statement to police, "If I did something then I probably thought it was my ex-wife." Johnson pointed out that he also said that he didn't know what happened. On the stand, he said that he knew "for a fact" that it didn't happen. "Well, I know I wouldn't ever touch anybody, period." When the

16

A.D.A. reminded him that wasn't what he said a year ago to detectives, Johnson's reply was, "I never admitted to anything." Johnson denied that there were any other incidents and claimed that his behavior at the concert wasn't inappropriate because "we were all doing it to each other."

On redirect examination, Johnson explained that he didn't recall a discussion about a second incident at a bar. He knew about it from his father-in-law's fiancée, but his ex-father-in-law told him it didn't happen, so it wasn't an "incident." There was never a point that night in November 2022 that he told the girls to drink beer. He told them two things, "Respect the house, and don't do nothing dumb."

*Analysis*

The evidence in this case is sufficient to support the jury's verdict that the defendant is guilty of molestation of a juvenile. The record shows that the defendant's testimony was not that different from the information he provided during his interview with detectives. It was within the jury's province to accept or reject the testimony of the witnesses as to these acts and incidents. The evidence established that Johnson committed a lewd and lascivious act upon the victim. H.M.'s account of the events of the incident to Ms. Hughes in the Gingerbread House interview and her testimony in court was consistent and unwavering. The surrounding corroborative facts and events were similarly described by all three persons involved. The fact that the defendant touched H.M.'s vaginal area while he was intoxicated and both of them were wearing clothes and "spooning" does not negate the criminality of his conduct. *See*, *State v. Brown*, 55,466, p. 14 (La. App. 2 Cir. 3/13/24), 381 So. 3d 1007, 1018, *writ denied*, 24-00452 (La. 11/20/24), 396 So. 3d 69.

We further find borderline ludicrous the argument that Johnson did not have supervision or control over H.M.  He was the former stepfather of O.H., the victim's friend.  O.H. testified that she thought of him like a father.  The parents of both girls had entrusted Johnson to host and supervise them for their short overnight trip to the deer lease.  The fact that Johnson took O.H. and H.M. there so they could "hang out" and "safely" drink alcoholic beverages does not negate the fact that he was the adult in charge of them.  As noted above, the other elements of the crime of molestation of a juvenile were not contested by the defendant.

This assignment of error is without merit.

**Evidence of Other Crimes or Bad Acts**

Johnson asserts that the trial court improperly introduced at trial evidence of other acts which involved adult women.  The source of this evidence came from the defendant's statement to the detectives when he referred to previous incidents involving adult women that occurred when he had been drinking.

Appellate counsel argues that, at the conclusion of the free and voluntary hearing held on February 26, 2024, the first day of trial, defense counsel objected to the introduction into evidence of the first two statements as violative of La. C.E. arts. 404(B) and/or 412.2.  The State's position was that evidence about the incidents was admissible because it was deemed admissible when the Gingerbread House video was found admissible (October 24, 2023).[8]  In that video, the victim, H.M., stated that the defendant told her something about "butts at a concert."  Appellate counsel

---

[8] This finding was apparently made at a status conference on October 24, 2023, according to the court minutes.

18

asserts that the purpose of the Gingerbread House hearing was to determine the admissibility of the taped interview *as a whole*—a ruling on the admissibility of the interview does not mean that inadmissible statements cannot be redacted from the interview.

Rather than complying with article 720, which requires notice if the prosecution intends to introduce evidence of other crimes pursuant to La. C. Cr. P. art. 404(B) or 412.2, the State had a paragraph in its "boiler plate" answer to discovery which only referred to evidence of prior convictions and even then, did not identify for what admissible purpose the other crimes evidence would be if used at trial. Nonetheless, the trial court found that this satisfied all of the requirements relevant to providing notice of other crimes evidence, relying mainly on the voluntary nature of Johnson's own statement than to which exception to the prohibition against the use of such evidence was applicable.

According to the defendant, the other crimes evidence in this case did not fall within the scope of La. C. Cr. P. art. 412.2, which provides only for the admissibility of evidence of other crimes, wrongs, or acts to show a lustful disposition towards children. Evidence which is merely evidence of another sexual offense not involving children is inadmissible under article 412.2. *See*, *State v. Parker*, 42,311 (La. App. 2 Cir. 8/15/07), 963 So. 2d 497.

Furthermore, urges defense counsel, La. C.E. art. 404(B)(1) provides that a trial court may not admit evidence of other crimes to show that a defendant is a person of bad character who has acted in conformity therewith, and such evidence is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." *See*, *State v. Prieur*,

277 So. 2d 126 (La. 1973). Even if the prior bad acts evidence may otherwise be admissible, the trial court must balance its probative value against its prejudicial effects. La. C.E. art. 403. According to the defendant, the statements related to uncharged conduct between him and adult women had little to no probative value in the instant case, particularly considering the State's failure to prove system, motive, intent, plan, knowledge, or identity. The prejudicial effect of the statements was great, and the interviews of both the victim and the defendant should have been redacted to remove all references to them, urges Johnson.

The State contends that the recent prior acts of the defendant in getting "blackout drunk" and groping the private parts of women is relevant to establish intent, motive, opportunity, identity, and absence of mistake or accident, as these acts tend to show that he believed he could act with impunity in committing his crimes, since he had done the same thing "multiple times" without any consequences. The State argues that this evidence further tends to prove Johnson's intent and his method of opportunity to sexually abuse women. As the trial court stated, "Mr. Johnson volunteered the information…to the detective when he was being interviewed." The trial judge also found relevant that Johnson had apparently talked about these instances with H.M., who discussed them in her Gingerbread House interview. As the trial court observed, "[I]t would be awfully strange if…the alleged victim made up a statement that turned out to be almost exactly consistent with a statement that Mr. Johnson made when he's interviewed by the detective, a statement that he made voluntarily."

The State urges that the trial court did not abuse its discretion by allowing the evidence of other crimes, wrongs, or acts to be presented at the

20

defendant's trial. However, assuming that the admission of this evidence was erroneous, it was harmless as there was overwhelming evidence of Johnson's guilt.

***Applicable Legal Principles***

A trial court's ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. *State v. Wright*, 11-0141, pp. 10-11 (La. 12/6/11), 79 So. 3d 309, 316. This same standard is applied to rulings on the admission of other crimes evidence and evidence under La. C.E. art. 412.2. *Id*., 11-0141, p. 11, 79 So. 3d at 316; *State v. Williams*, 02-1030, p. 5 (La. 10/15/02), 830 So. 2d 984, 987. Relevant evidence of other crimes, wrongs, or acts involving sexually assaultive behavior ***or*** which indicate a lustful disposition toward children may be admissible under La. C.E. art. 412.2 if its probative value substantially outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. La. C.E. art. 403; *State v. Johnson*, 50,005, pp. 13-14 (La. App. 2 Cir. 8/12/15), 175 So. 3d 442, 453, *writ denied*, 15-1687 (La. 9/16/16), 206 So. 3d 203; *State v. Johnson*, 43,843, p. 14 (La. App. 2 Cir. 1/28/09), 2 So. 3d 606, 614-15, *writ denied*, 09-0464 (La. 11/06/09), 21 So. 3d 300. When evidence is sought to be admissible under art. 412.2, while notice is required, there is no requirement for a pre-trial hearing. *State v. Williams*, 02-1030, p. 6, 830 So. 2d at 987.

As set forth in *State v. Layton*, 14-1910, p. 5 (La. 3/17/15), 168 So. 3d 358, 360, La. C.E. art. 412.2 does not strictly limit evidence of past "sexually assaultive behavior" to sexual offenses defined by state law. Furthermore, La. C.E. art. 412.2 "does not limit the admissibility of prior

21

acts only to those identical or similar in nature." *State v. Wright*, 11-0141, pp. 9-10, 79 So. 3d at 315; *State v. Sessions*, 21-0118, p. 6 (La. App. 4 Cir. 12/14/21), 332 So. 3d 729, 736-37; *State v. Williams*, 11-876, p. 9 (La. App. 5 Cir. 3/27/12), 91 So. 3d 437, 441, *writ denied*, 12-1013 (La. 9/21/12), 98 So. 3d 334.

It is not necessary, for purposes of Article 412.2 testimony, for the defendant to have been charged, prosecuted, or convicted of the "other acts" described. *State v. Layton*, *supra*; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203. The admissibility of such statements under La. C.E. art. 412.2 is dependent on whether the probative value of the statements substantially outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. La. C.E. art. 403; *State v. Williams*, *supra*; *State v. Dale*, *supra*.

### *Analysis*

The hearings at which the trial court's rulings on the admissibility of alleged other crimes or bad acts evidence occurred were not transcribed. In fact, these hearings were held to rule on motions regarding the admissibility of the two Gingerbread House interviews and the free and voluntary nature of the defendant's statement to detectives. Apparently after finding all statements to be admissible, the trial court then entertained specific defense objections to portions of the victim's interview and Johnson's statement. Contrary to appellate counsel's argument in brief, as set forth by the Louisiana Supreme Court in *State v. Wright*, *supra*, La. C.E. art. 412.2 does not limit the State to admissibility of evidence of other crimes, wrongs, or acts to "only those identical or similar in nature" to the offense with which

22

the defendant was charged. *Id.*, 11-0141, pp. 9-10, 79 So. 3d at 315. Additionally, all the State is required to provide a defendant with is notice of its intent to offer evidence of the specific crimes, wrongs, or bad acts.

In this case, the State provided the defense with notice of its intent to use the video statements/interviews of Johnson and H.M. in its discovery responses. After considering the arguments made by defense counsel and the A.D.A., the trial court found the evidence of the alleged bad acts to be admissible. Defense counsel had time to prepare, and at trial, counsel was able to cross-examine the State's witnesses and question Johnson and other defense witnesses as to these alleged bad acts. There were no contemporaneous objections to this evidence re-urged at trial; in fact, while cross-examining the State's witnesses and during Johnson's testimony, defense counsel was able to elicit clarification and further explanation as to this evidence, thus giving the jury more context for it. Even if the trial court's rulings pre-trial rulings were erroneous, they were harmless, in light of this record.

This assignment of error is without merit.

### CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, James Russel Johnson, Jr., are affirmed.

**AFFIRMED.**

23